UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

KATINA D. MULLER,                      :      Case No. 3:12-cv-151
                                       :
         Plaintiff,                    :      Judge Timothy S. Black
                                       :
vs.                                    :
                                       :
ERIC K. SHINSEKI, Secretary of         :
Department of Veterans Affairs,        :
                                       :
         Defendant.                    :

**DECISION AND ENTRY GRANTING DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT (Doc. 25)**

This case is before the Court on Defendant's Motion for Summary Judgment.

(Doc. 25).  Plaintiff Katina Muller ("Plaintiff") filed a Memorandum in Opposition to

Defendant's Motion (Doc. 35), and  Defendant filed a Reply in Support of its Motion for

Summary Judgment.  (Doc. 36).    Defendant's Motion is now ripe for decision.

## I.  FACTS

Pursuant to the Standing Order of the Court, Defendant filed a Statement of

Proposed Undisputed Facts.  (Doc. 18).  Plaintiff responded to Defendant's Statement of

Proposed Undisputed Facts. (Doc. 21). [1]   The Court's statement of facts set forth here

---

[1] Plaintiff generally denies a number of  Proposed Undisputed Facts as set forth by Defendant.  A number of Plaintiff's general denials fail to provide a citation to evidence in the record.  Such failure violates this Court's Standing Order Governing Civil Motions for Summary Judgment.  The Standing Order requires that "[e]ach statement of material fact in a statement of Proposed Undisputed Facts or Response to Proposed Undisputed Facts, and each denial in a statement of Disputed Issues of Material Fact, must be followed by a specific citation or citations to (1) the affidavit of a witness competent to testify as to the facts at trial, (2) a sworn deposition, and/or (3) other evidence, including documentary evidence, that would be admissible at trial."

incorporates the facts undisputed by the parties and the facts confirmed by the Court upon review of the  citations to the evidentiary record provided by the parties.

Plaintiff alleges claims of race discrimination and retaliation.  (Doc. 1).  Plaintiff is an African American female who was employed as a nurse assistant at the Dayton Veterans Affairs Medical Center (the "DVAMC") in Dayton, Ohio from 2004 to 2008. (Docs. 18, 21).  Plaintiff began her employment with the DVAMC as a nursing assistant on the Mobile Resource Team on June 13, 2005.  (*Id*.).  Plaintiff then began working full time for the DVAMC at Section 5 South, "Soaring Eagles," on December 11, 2005.  (*Id*.)

During Plaintiff's employment, Marna McCrary was Plaintiff's direct supervisor. (Doc. 29, PAGEID 347; Doc. 30, PAGEID 419).  Ms. McCrary racially identifies as bi-racial.  (Doc. 30, PAGEID 418-419).  Connie Shiverdecker was Plaintiff's second-level supervisor since Plaintiff was employed in 2005.  (Doc. 29, PAGEID 347; Doc. 30-1, PAGEID 449).  Ms. Shiverdecker is Caucasian.  (Doc. 30-1, PAGEID 454).  Carol Alhers was the associate chief nurse, Ms. Shiverdecker's direct supervisor, and the highest leave-granting authority during August and September of 2007.  (Doc. 27, PAGEID 301).

Plaintiff alleges that she was subject to disparate treatment because of her race during her employment at the DVAMC by her second level supervisor, Connie Shiverdecker.  In fact, Plaintiff states that Ms. Shiverdecker is the only person at the DVAMC who allegedly discriminated against her during her employment.

Plaintiff asserts that Ms. Shiverdecker's alleged discrimination is evidenced by the following employment actions taken against Plaintiff during her employment: (A) an

admonishment following an August 2007 incident in which Plaintiff complained about the DVAMC's care of her father; (B) Plaintiff's absences being designated as absent without leave ("AWOL") as opposed to leave without pay ("LWOP") in August and September 2007; (C) actions taken against Plaintiff following an allegation of patient abuse in November 2007; and (D) statements allegedly made by Ms. Shiverdecker's that purportedly evidence Ms. Shiverdecker's discriminatory animus against Plaintiff.

### A.    Admonishment for August 2007 Incident

In August 2007, Plaintiff's father was admitted to the DVAMC in critical condition for congestive heart failure.  (Doc. 27, PAGEID 257-274).  On August 18, 2007, Plaintiff reported to work and informed the charge nurse, Glenda Beach, about her father's hospitalization and informed Ms. Beach that she would be checking on her father periodically during his hospitalization.  (*Id*.)  Ms. Beach approved Plaintiff's requests to visit her father during Plaintiff's work breaks.  (*Id*.)

On August 18, 2007, Plaintiff took her first work break and visited her father at approximately 10:30 a.m.  (*Id*.)  Upon visiting her father, Plaintiff saw that he had not received his morning care.  (*Id*.)  Plaintiff approached the charge nurse, Robin Livingston, and informed Ms. Livingson about her father's lack of care that morning.  (*Id*.)  After Ms. Livingston verified the lack of care, Ms. Livingston called one of the nursing assistants, "Kim," to inquire about the lack of care.  (*Id*.)  As Kim explained herself, another nursing assistant, Deanna Allen, became confrontational toward Plaintiff.  (*Id*.)  Because Plaintiff was upset and "getting mad" at the lack of concern from the other

nurse assistants, she yelled back at Ms. Allen.  (*Id.*)  Thereafter, Plaintiff's sister arrived at the hospital and Plaintiff returned to work.  (*Id.*)

Subsequently, Ms. Shiverdecker conducted a fact-finding into the incident and determined that Plaintiff displayed disruptive behavior and attempted to verbally intimidate staff involved in the care of her father.  (Doc. 31-3, PAGEID 505).  In support of her findings, Ms. Shiverdecker pointed out that the staff were "visibly shaken and concerned for their safety," a patient came out of his room to see what the disruption was in the hallway, and Plaintiff was gesturing with her arms and pointing her finger at the staff.  (Doc. 27, PAGEID 257-274).  Ultimately, Plaintiff received an admonishment for her behavior, which did not result in a pay decrease or any a reduction in Plaintiff's pay grade or step.  (Doc. 27, PAGEID 273-274).

### B.    Leave Without Pay and Absent Without Leave

In August and September of 2007, Plaintiff had no paid leave available to her. (Doc. 30, PAGEID 427).  Regardless, Plaintiff was absent from work at the DVAMC multiple times.  (*Id.*; Doc. 30-1, PAGEID 458).  Ms. McCrary reported that, on several occasions during August and September of 2007, Plaintiff did not call in to report that she would not attend work that day.  (Doc. 30, PAGEID 427).  Plaintiff was charged as Absent Without Leave ("AWOL") on those dates.  (Doc. 30, PAGEID 428-429; Doc. 30-1, PAGEID 458).

According to Plaintiff, she alleges that her leave without pay requests in August and September 2007 were approved by Ms. McCrary and then subsequently changed to AWOL by Ms. Shiverdecker.  (Doc. 27, PAGEID 326).  Plaintiff testified that Ms.

4

McCrary informed her that Ms. Shiverdecker denied the LWOP request and deemed the absences as AWOL.  (Doc. 27, PAGEID 300-301, 326-328).  According to Ms. McCrary, however, Plaintiff requested the leave without pay after the fact and that she simply recommended that Plaintiff be given LWOP, as opposed to being deemed AWOL.  (Doc. 30, PAGEID  428).  Ms. Shiverdecker denied charging Plaintiff as AWOL and maintained that the denial of LWOP was "at a much higher level than" her.  (Doc. 30-1, PAGEID 459-460).

Pursuant to the DVAMC's leave policy applicable to general schedule employees, employees can receive up to thirty days of leave without pay ("LWOP").  (Doc. 31-1). LWOP can be approved by the "service chief" or "care line manager."  (Doc. 31-1). Plaintiff had approximately 147 hours of unpaid leave.  (Doc. 30-1, PAGEID 460).  In Plaintiff's case, the individual ultimately vested with the ability to approve LWOP for Plaintiff was Ms. Alhers.  (Doc. 27, PAGEID 301; Doc. 30-1, PAGEID 459-460). According to Plaintiff, LWOP "looks better" on an employee's record than AWOL, and AWOL may affect a government employee's retirement calculations and other benefits where LWOP would not.[2]  (Doc. 27, PAGEID 326).

### C.    Alleged Patient Abuse

On November 27, 2007, Plaintiff reported to work at approximately 5:30 p.m. and received a telephone call shortly after she arrived.  (Doc. 27, PAGEID 274, 276).

---

[2] In her Response to Defendant's Proposed Statement of Undisputed Facts, Plaintiff asserts, without record citation, that "that the AWOL charged to her has affected her retirement calculations and other benefits[.]"  (Doc. 35, PAGEID 587).  During her deposition, Plaintiff testified that being charged as AWOL "can affect your retirement[.]"  (Doc. 27, PAGEID 326).  Plaintiff points to no evidence supporting any contention that her retirement was, in fact, affected by her absences being marked as AWOL, as opposed to LWOP.

Plaintiff accepted the personal call at the nurse's station.  (Doc. 27, PAGEID 278).

While Plaintiff was on the phone, Sandy Kunze, a Licensed Practical Nurse, was calling

for Plaintiff's assistance with a patient.  (Doc. 27, PAGEID 280).  Plaintiff answered the

call and went to assist Ms. Kunze with a patient.  (Doc. 27, PAGEID 281).  The patient

was the responsibility of both Ms. Kunze and Plaintiff.  (Doc. 27, PAGEID 281).

Upon Plaintiff's arrival to assist, Ms. Kunze was changing a patient's colostomy

and asked Plaintiff to clean the patient.  (Doc. 27, PAGEID 282-283).  Plaintiff asked Ms.

Kunze to help her since Ms. Kunze had already started the task.  (Doc. 27, PAGEID 283).

Ms. Kunze responded to Plaintiff by asking Plaintiff to stop arguing.  (Doc. 27, PAGEID

285-286).  Before Plaintiff rendered any care for the patient, she left the room to get a

supervisor.  (Doc. 27, PAGEID286, 288).

On November 28, 2007, Ms. McCary received a voicemail message from a patient

who wanted to speak with her.  (Doc. 30, PAGEID 424).  Ms. McCrary subsequently

spoke with the patient who informed her that there was a big fight over his care between

a nursing assistant and nurse.  (*Id*).  The patient stated that both he and his roommate

were fearful for their safety and that they did not trust the DVAMC as a result.[3]  (*Id*.)

The patients provided Ms. McCrary with descriptions of the nurse and the nursing

---

[3] A Board of Investigation issued a Memorandum following the investigation into the incident.  The
roommate of veteran patients interviewed during the investigation stated that Plaintiff "entered his room yelling at
the older nurse," and that "the older nurse did not argument, but continued with caring for his roommate."  (Doc. 32,
PAGEID 506).  The veteran patient with the colostomy stated that Plaintiff "came in the room arguing," which
"made him concerned about the type of care he would receive from the nurse that entered the room arguing."  (*Id.*)
During his testimony in front of the Board, the Board indicated that the veteran patient was hoping that Ms. Kunze
would "not leave him alone with" Plaintiff, and that he did not want Plaintiff "putting her hands on [him] at that
point, [be]cause [he] knew there wasn't gonna be no TLC there, you know, as angry as she was."  (Doc. 32,
PAGEID 507).

assistant.  (*Id*.)  Upon hearing the description, Ms. McCrary believed Ms. Kunze was the nurse described and that Plaintiff was the nurse assistant described.  (*Id*.)

Thereafter, Ms. McCrary contacted Plaintiff and Ms. Kunze, offered them union representation and conducted a fact-finding about the incident.  (*Id*.)  Based on her findings, Ms. McCrary concluded that Plaintiff was appropriately accused of patient abuse and recommended that Plaintiff be removed from patient care during the official investigation.  (*Id*.)[4]  Plaintiff was subsequently reprimanded for her actions and detailed to Nutrition and Food Services indefinitely pending the outcome of a Board of Investigation inquiry into the patient abuse allegations.  (Doc. 27, PAGEID 291-292).[5]

A Board of Investigation consisting of registered nurse, Shelly Logan, nurse assistant, Candace Davis, and Doctor of Psychology, Eric Drown, convened to investigate the alleged patient abuse incident.  (Doc. 32).  Ms. Shiverdecker was not affiliated with the Board in any way and did not provide testimony for the Board's consideration.  (*Id*)  Following its investigation, the Board concluded that Plaintiff's

---

[4] Pursuant to the DVAMC's Violent Behavior Prevention Program, "[p]atient abuse is defined as any act that involves physical, psychological, sexual, or verbal abuse."  Examples of patient abuse, according to the Violent Behavior Prevention Program, include "[i]ntentional omissions of care" and "intimidation[.]"  (Doc. 32-1, PAGEID 516).  According to the Violent Behavior Prevention Program, "[a] patient's perception of how he or she was treated is essential to determining whether abuse occurred, although patients of limited or no cognitive ability may still be abused."  (Id.)

[5] Pursuant to the Master Agreement between the Department of Veterans Affairs and the American Federation of Government Employees, "[a] detail is a temporary assignment of an employee to a different position for a specified period of time with the employee returning to regular duties at the end of the detail."  (Doc. 32-3, PAGEID 523).  Should an individual be detailed to a lower-level position, the detail "will in no way adversely affect the employee's salary, classification or position of record."  (Doc. 32-3, PAGEID 524).  Plaintiff admits that her detail was temporary in nature, that she would have been permitted to return to her regular position after the Board of Investigation reached a conclusion, and that she suffered no decrease in pay, and no change in grade or step, during the detail.  (Doc. 27, PAGEID 177).

actions constituted patient abuse and recommended that Plaintiff be disciplined and subject to administrative action as appropriate. (Doc. 32, PAGEID 514-515).

Plaintiff left the DVAMC in February 2008, and began work at the Central Alabama Veterans Health Care System ("CAVHCS") in Alabama that same month. (Doc. 27, PAGEID 292, 293; Doc. 29, PAGEID 353-354). In February of 2008, the Associate Chief Nurse at the DVAMC, Ms. Alhers, called the CAVHCS Acting Associate Director for Patient Care Services, Sarah Williams, to inform her of the Board's recommendation that Plaintiff be terminated for patient abuse. (Doc. 33-1, PAGEID 538-539).

On July 7, 2008, Plaintiff received a memorandum from the Acting Deputy Associate Director at CAVHCS, Carolyn Carver, proposing to remove her from VA employment for patient abuse. (Doc. 33-2, PAGEID 548-550). Plaintiff timely replied, and then contacted James Lowe, the Union President for AFGE Local 110, CAVHCS in Tuskegee, Alabama. Mr. Lowe conducted his own fact-finding and presented it to the Acting Deputy Associate Director. Subsequently, the CAVHCS revoked the proposed removal after concluding that the incident was a DVAMC issue and the CAVHCS did not want to become involved.

### D. Derogatory Statements

According to Plaintiff, in the fall of 2006, when Ms. Shiverdecker learned that Plaintiff was pregnant with her seventh child, Ms. Shiverdecker told Plaintiff, "you black

girls don't believe in birth control, do you?"[6]  (Doc. 27, PAGEID 245-246).  In August of 2007, Ora Johnston, Plaintiff's former direct supervisor, allegedly told her that Connie Shiverdecker once said that it was "too bad [Plaintiff] made it past her probationary period because [she] would have fired [her]."  (Doc. 27, PAGEID 252-253).  In November of 2007, Plaintiff claims that Ms. Shiverdecker told her that she was "just like Sherry Summerlot, only the black version."  (Doc. 27, PAGEID 240-242).

## II.  STANDARD OF REVIEW

A motion for summary judgment should be granted if the evidence submitted to the Court demonstrates that there is no genuine issue as to any material fact and that the movant is entitled to summary judgment as a matter of law.  Fed. R. Civ. P. 56; *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-248 (1986).  "Summary judgment is only appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'"  *Keweenaw Bay Indian Comm. v. Rising*, 477 F.3d 881, 886 (6th Cir. 2007) (quoting Fed. R. Civ. P. 56(c)).  "Weighing of the evidence or making credibility determinations are prohibited at summary judgment  -  rather, all facts must be viewed in the light most favorable to the non-moving party."  *Id*.

---

[6] Defendant, in its Statement of Proposed Undisputed Facts (Doc. 25-1), asserts that this alleged statement by Ms. Shiverdecker was not brought up during the administrative adjudicative process, and, therefore, has no relevance here.

Once "a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading[.]" *Viergutz v. Lucent Technologies, Inc.*, 375 F. App'x 482, 485 (6th Cir. 2010) (citation omitted). Instead, the party opposing summary judgment "must - by affidavits or as otherwise provided in this rule - set out specific facts showing a genuine issue for trial." *Id*. (citation omitted). In fact, Fed. R. Civ. P. 56(c) states that "[a] party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record . . . or . . . showing that the material cited do not establish the absence . . . of a genuine dispute[.]" Where "a party fails . . . to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion." Fed. R. Civ. P. 56(e)(2).

Finally, "there is no duty imposed upon the trial court to 'search the entire record to establish that it is bereft of a genuine issue of material fact.'" *Buarino v. Brookfield Twp. Trustees*, 980 F.2d 399, 404 (6th Cir. 1992) (citations omitted). Instead, "[i]t is the attorneys, not the judges, who have interviewed the witnesses and handled the physical exhibits; it is the attorneys, not the judges, who have been present at the depositions; and it is the attorneys, not the judges, who have a professional and financial stake in case outcome." *Id*. at 406. In other words, "the free-ranging search for supporting facts is a task for which attorneys in the case are equipped and for which courts generally are not." *Id*.

10

### III. RACE DISCRIMINATION

In her Complaint, Plaintiff asserts two counts: (A) race discrimination; and (B) retaliation. Defendant moves for summary judgment on both of Plaintiff's claims. The Court first addresses Plaintiff's claim of race discrimination. Noting that Plaintiff presents no direct evidence of discrimination in this case, the parties analyze Plaintiff's race discrimination claim under the framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

Under the *McDonnell Douglas* framework, Plaintiff bears the initial "burden of establishing a *prima facie* case of race discrimination[.]" *Carson v. Patterson Companies, Inc.*, 423 F. App'x 510, 513 (6th Cir. 2011). To establish a *prima facie* case of race discrimination, Plaintiff must show that: "(1) [s]he is a member of a protected class; (2) he was qualified for his job; (3) [s]he suffered an adverse employment decision; and (4) [s]he was replaced by a person outside the protected class or treated differently than similarly situated non-protected employees." *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 391 (6th Cir. 2008) (citations omitted).

Here, Defendant argues that Plaintiff cannot demonstrate a *prima facie* case of discrimination because: (A) she did not suffer an adverse employment action; (B) she cannot identify a similarly situated individual treated more favorably than her; and (C) she cannot demonstrate pretext.

#### A.     Plaintiff's *Prima Facie* Case

"An adverse employment action 'constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different

responsibilities, or a decision causing a significant change in benefits.'" *Johnson v. Franklin Farmers Co-Op.*, 378 F. App'x 505, 508 (6th Cir. 2010) (citations omitted). The Sixth Circuit holds "that '*de minimis* employment actions are not materially adverse and, thus, not actionable.'" *Kyle-Eiland v. Neff*, 408 F.App'x 933, 941 (6th Cir. 2011) (citation omitted). Adverse employment actions are "something more than 'petty slights, minor annoyances, and simple lack of good manners.'" *Id.* (citation omitted).

Here, Plaintiff contends that she was subject to adverse employment actions when: (1) she was detailed pending the patient abuse allegation in 2007; (2) absences in August and September 2007 were marked as AWOL; (3) she was subject to a "fact-finding" following her complaints about her father's lack of care on the morning of August 18, 2007; (4) she received an admonishment and a reprimand; and (5) she received a memorandum of proposed removal following allegations of patient abuse following the November 27, 2007 incident. In addition, although never expressly argued in Plaintiff's response, Plaintiff does suggest that she was constructively discharged upon leaving the DVAMC and relocating to the CAVHCS in Alabama.

### 1. Detailed Pending Patient Abuse Investigation

Plaintiff first contends that she suffered an adverse employment action when Defendant detailed her to a different unit during Defendant's investigation of the patient abuse allegations. The Sixth Circuit has held that "reassignments without salary or work hour changes do not ordinarily constitute adverse employment decisions in employment discrimination claims." *Kocsis v. Multi-Care Management, Inc.*, 97 F.3d 876, 885 (6th Cir. 1996) (citing *Yates v. Avco Corp.*, 819 F.2d 630, 638 (6th Cir. 1987). Here, there is

no dispute that the detail was temporary in nature and that Plaintiff would have return to her normal position if the investigation was resolved in her favor. Further, there is no dispute that, during the detail, Plaintiff suffered no decrease in pay.

Plaintiff, in arguing that the detail amounted to an adverse employment action, fails to point to any facts to show that the detail resulted in a significant change in employment status. As noted by the Sixth Circuit, "issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones." *McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997) (citation omitted). Plaintiff's perfunctory, undeveloped and conclusory contentions arguing that her detail reassignment amounted to a significant change in employment status fail to create a genuine issue of material fact.

### 2. Charged as AWOL

Plaintiff next contends that she suffered an adverse employment action in 2007 when Connie Shiverdecker allegedly deemed her AWOL as opposed to marking her absences as LWOP.[7] The issue presented is whether the difference between LWOP and

---

[7] The record appears to contain two separate AWOL instances: (1) in 2005, when Plaintiff sought leave soon after her initial hire for her wedding and honeymoon; and (2) in August and September 2007, when Plaintiff sought 147 hours of leave when her father was ill. Plaintiff's response to Defendant's Motion for Summary Judgment in this regard, while referring to Plaintiff's absences deemed AWOL in 2007, conflates the two instances by pointing to the 2007 date, but attributing the circumstances surrounding Plaintiff's leave request for her 2005 wedding to argue the existence of an adverse employment action.

It should be noted that Plaintiff admits that she was ultimately permitted leave without pay for her wedding in 2005. (Doc. 29, PAGEID 400; Doc. 35, PAGEID 600). Therefore, the circumstances surrounding Plaintiff's request for leave to attend her wedding do not amount to an adverse employment action because she suffered no significant change in employment status.

13

AWOL constitutes a significant change in employment status.  Plaintiff presents only a perfunctory and confusing argument in this regard and omits any citation to authority supporting the proposition that absences being designated as AWOL, instead of LWOP, amounts to a significant change in employment status.

While Plaintiff did testify that absences marked as AWOL "can affect your retirement," Plaintiff points to no evidence that her retirement was, in fact, ever impacted or that she suffered some other significant repercussion from her absences being deemed AWOL, as opposed to LWOP.  Again, "issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived." *McPherson*, 125 F.3d at 995-96.  Based upon the record before the Court, there is no genuine issue of fact remaining that shows Plaintiff's absences being designated as AWOL amounts to an adverse employment action.

3.    Fact-Finding Investigation

Plaintiff also argues that she suffered an adverse employment action when Ms. Shiverdecker conducted a fact-finding investigation into Plaintiff's actions during her visit with her father at the DVAMC in August 2007.  An investigation alone, however, without any change in "the form or conditions of . . . employment[,]" does not amount to an adverse employment action.  *Kuhn v. Washtenaw Cnty.*, 709 F.3d 612, 626 (6th Cir. 2013); *see also Dendinger v. Ohio*, 207 F. App'x 521, 527 (6th Cir. 2006) (stating that "[w]e have repeatedly held, however, that neither an internal investigation into suspected wrongdoing by an employee nor that employee's placement on paid administrative leave pending the outcome of such an investigation constitutes an adverse employment

14

action"); *Peltier v. United States*, 388 F.3d 984, 988 (6th Cir. 2004).

Plaintiff fails to acknowledge these binding authorities or cite any authority to the contrary. Accordingly, the Court rejects Plaintiff's unsupported contention that she was subject to an adverse employment action merely because Ms. Shiverdecker conducted a fact-finding investigation following the August 2007 incident.

4. <u>Admonishment and Reprimand</u>

Next, Plaintiff argues that she suffered an adverse employment action when she was admonished after the August 2007 incident concerning her father's care at the DVAMC. Plaintiff also contends that she suffered an adverse employment action upon receiving a reprimand as a result of the alleged patient abuse on November 27, 2007.

As held by the Sixth Circuit, "[a] written reprimand, without evidence that it led to a materially adverse consequence such as lowered pay, demotion, suspension, or the like, is not a materially adverse employment action." *Creggett v. Jefferson Cnty. Bd. of Educ.*, 491 F. App'x 561, 566 (6th Cir. 2012) (citing *Lahar v. Oakland Cnty.*, 304 F. App'x 354, 357–58 (6th Cir. 2008)) (further citations omitted). The same rationale applies to admonishments. *See Atanus v. Perry*, 520 F.3d 662, 675 (7th Cir. 2008) (concluding that admonishments do not rise to the level of adverse employment actions absent some showing that the admonishment had "tangible job consequences . . . such as an eligibility for promotion, transfer to a favorable location, an advantageous increase in responsibilities or similar benefits") (citing *Sweeney v. West*, 149 F.3d 550, 556-57 (7th Cir. 1998); *see also Kohus v. Ohio State Highway Patrol*, No. 1:09-cv-658, 2011 WL 1234021 (S.D. Ohio Feb. 15, 2011) (noting that "disciplinary actions that do not result in

15

a loss of pay are not ordinarily 'adverse'").

     5.    <u>Recommended Dismissal</u>

Finally, Plaintiff contends that she suffered an adverse employment action when the administrative Board of Investigation concluded that her actions on November 27, 2007 constituted patient abuse and Defendant ultimately recommended that Plaintiff be terminated from her position. There is no dispute that the proposed termination was later revoked, and at least one court within the Sixth Circuit has concluded that a proposed removal is not an adverse employment action where the "proposed removal never materialized." *Varela v. Potter*, No. 3:02-CV-334-S, 2006 WL 861274 (W.D. Ky. Mar. 29, 2006).

Here, however, Plaintiff's response to Defendant's Motion for Summary Judgment suggests that Plaintiff transferred from the DVAMC to CAVHCS because she knew she was likely to be terminated from the DVAMC as a result of the patient abuse allegations. Plaintiff suggests, without specifically arguing, that her transfer amounts to a constructive discharge.

"Constructive discharge occurs when an employer, 'rather than acting directly, deliberately makes an employee's working conditions so intolerable that the employee is forced into an involuntary resignation.'" *Peecock v. Northwestern Nat'l Ins. Group*, 156 F.3d 1231, 1998 WL 476245, *3 (6th Cir. Aug. 3, 1998) (citing *Pena v. Brattleboro Retreat*, 702 F.2d 322, 325 (2nd Cir. 1983)). "To constitute a constructive discharge, the employer must deliberately create intolerable working conditions, as perceived by a reasonable person, with the intention of forcing the employee to quit and the employee

16

must actually quit." *Moore v. KUKA Welding Sys. & Robot Corp.*, 171 F.3d 1073, 1080

(6th Cir. 1999); *see also Cleveland v. S. Disposal Waste Connections*, 491 F. App'x 698,

708 (6th Cir. 2012); *Logan v. Denny's Inc.*, 259 F.3d 558, 568–69 (6th Cir.2001).   In

determining whether a constructive discharge occurred, courts must consider "both the

employer's intent and the employee's objective feelings[.]"  *Id.* (citing *Held v. Gulf Oil

Co.*, 684 F.2d 427 (6th Cir. 1982).

    Here, the constructive discharge theory upon which Plaintiff appears to argue

centers on the working environment allegedly created by Ms. Shiverdecker.  In

apparently advancing a constructive discharge claim, Plaintiff suggests that Ms.

Shiverdecker charged Plaintiff with patient abuse and issued a letter of proposed removal

solely in an effort to either terminate Plaintiff or cause Plaintiff to resign.  (Doc. 35,

PAGEID 555).  However, Plaintiff points to no evidence supporting the contention that

Ms. Shiverdecker either charged Plaintiff with patient abuse or issued a letter of

proposed removal.  In fact, the undisputed facts in this case demonstrate that Ms.

McCrary first became aware of the patient abuse incident from the patient involved.

That patient informed Ms. McCrary of a big fight between a nursing assistant and nurse.

(Doc. 30, PAGEID 424-425).  Further, Ms. McCrary, not Ms. Shiverdecker, conducted

the fact-finding about the incident, and Ms. McCrary, not Ms. Shiverdecker, initially

concluded that Plaintiff was appropriately accused of patient abuse and recommended

Plaintiff be removed from the unit. (Doc. 30, PAGEID 425).[8]

Thereafter, a Board investigated the incident, found Plaintiff's actions constituted patient abuse, and recommended that Plaintiff be disciplined. Plaintiff cites no evidence showing that Ms. Shiverdecker was affiliated with the Board in any way or showing that Ms. Shiverdecker even provided any evidence for the Board's consideration. The only document in the record proposing that Plaintiff be removed her from employment for patient abuse was a memorandum from the Acting Deputy Associate Director at CAVHCS, Carolyn Carver. (Doc. 33-2, PAGEID 548-550).

Accordingly, based on the foregoing, there is an absence of any evidence in the record supporting Plaintiff's suggestion that Ms. Shiverdecker was involved in the patient abuse investigation and decision-making that Plaintiff alleges ultimately forced her to transfer to the CAVHCS in Alabama. Thus, there being no facts supporting Plaintiff's contention that Ms. Shiverdecker's actions resulted in Plaintiff's constructive discharge, the Court finds that such a claim is without merit.

6. *Prima Facie* Case Conclusion

Having failed to establish an adverse employment action, Plaintiff fails to demonstrate a *prima facie* case of discrimination. Therefore, the Court need not address Defendant's contention that Plaintiff fails to identify similarly situated employees treated more favorably than her.

_____

[8] Ms. Shiverdecker also testified that she was not involved in the investigation and that she did not know the specifics. Ms. Shiverdecker testified that her only involvement following the incident was preparing a letter issued to Plaintiff informing her of where she would be detailed pending the investigation. (Doc. 30-1, PAGEID 451-452).

### B.      Non-Discriminatory Reason and Pretext for Discrimination

Even assuming Plaintiff could demonstrate a *prima facie* case of discrimination arising from her alleged constructive discharge following patient abuse allegations, an employer can overcome the presumption of discrimination by articulating "a nondiscriminatory reason for its action[,]"  and "[e]mployers who provide a legitimate, non-discriminatory reason for their . . . decision will be entitled to summary judgment unless plaintiffs can rebut the employer's explanation by demonstrating pretext." *Bartlett v. Gates*, 421 F. App'x 485, 488 (6th Cir. 2010) (citations omitted).

"To establish pretext, a plaintiff must show that an employer's stated reason: (1) had no basis in fact; (2) did not actually motivate the challenged conduct; or (3) was insufficient to explain the challenged conduct." *Simpson v. Vanderbilt Univ.*, 359 F. App'x 562, 569-70 (6th Cir. 2009) (citing *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078 (6th Cir.1994)); *see also Bartlett*, 421 F. App'x at 490.  To meet this burden, a plaintiff must present "'sufficient evidence from which the jury could reasonably reject [the defendants'] explanation and infer that the defendants intentionally discriminated against him.'" *Id.* (citations omitted).  "[A] reason cannot be proved to be 'a pretext for discrimination' unless it is shown both that the reason was false, and that discrimination was the real reason." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515-16 (1993); *see also Simpson*, 359 F. App'x at 570.

Importantly, even though "the burdens of production shift, '[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against Plaintiff remains at all times with Plaintiff.'" *Risch v. Royal Oak Police Dept.*, 581 F.3d

383, 391 (6th Cir. 2009).  On a motion for summary judgment, this Court "considers

whether there is sufficient evidence to create a genuine dispute at each stage of the

*McDonnell Douglas* inquiry.'"  *Id.* at 390-91 (citing *Blair v. Henry Filters, Inc.*, 505 F.3d

517 (6th Cir.2007); *Cline v. Catholic Dioc. of Toledo*, 206 F.3d 651, 661 (6th Cir. 2000)).

Here, Defendant proffers a legitimate, non-discriminatory reason supporting

Plaintiff's recommended dismissal, *i.e.*, that the Board of Investigation conclusion that

Plaintiff's actions on November 27, 2007 constituted patient abuse.  (Doc. 32, PAGEID

514).  While Plaintiff suggests that this reason is not a "facially legitimate" reason for

recommending her dismissal, Plaintiff fails to elaborate on her conclusory contention in

this regard.  (Doc. 35, PAGEID 583).

Defendant, on the other hand, specifically points to the DVAMC's zero-tolerance

policy with regard to charges of patient abuse, which states that persons who engage in

patient abuse are subject to "adverse action, up to, and including removal . . . and/or

criminal prosecution."  (Doc. 32-1, PAGEID 516).  Based on the foregoing, the Court

concludes the Board's conclusion that Plaintiff engaged in patient abuse is a facially

legitimate, non-discriminatory reason to recommend that Plaintiff be terminated from her

employment with Defendant.

Again, because Defendant has demonstrated a non-discriminatory reason for

recommending Plaintiff's termination, the burden then shifts back to Plaintiff to "expose

this proffered justification as a pretext for . . . discrimination."  *Bergman v. Baptist

Healthcare Sys., Inc.*, 167 F. App'x 441, 447 (6th Cir. 2006).  In attempting to show

pretext, Plaintiff suggests that the patient abuse incident did not actually motivate the

recommended dismissal, and instead, the recommended dismissal was the culmination of Ms. Shiverdecker's alleged "systematic and continuing campaign of discrimination" against Plaintiff.  (Doc. 35, PAGEID 555, 581-82).

Plaintiff's suggestion in this regard has no merit for the same reasons set forth above, because the facts in the record demonstrate that Ms. Shiverdecker had no involvement in the patient abuse investigation or in the determination of discipline.  In other words, Plaintiff makes wholly unsupported allegations that Ms. Shiverdecker investigated the patient abuse allegations, determined who was detailed during the investigation, and determined the discipline meted out as a result.  Plaintiff fails to point to any evidence tending to support her contention that the recommended termination of Plaintiff's employment was motivated by Ms. Shiverdecker's alleged discriminatory animus toward Plaintiff.[9]

---

[9] Plaintiff also suggests, though makes no specific argument, that Ms. Shiverdecker's discriminatory animus is reflected in certain comments Ms. Shiverdecker purportedly made during Plaintiff's employment. Specifically, Plaintiff states that: (1) Ms. Shiverdecker once referred to Plaintiff as the "black version" of Sherry Sumerlot, a white employee; (2) upon learning of Plaintiff's pregnancy, Ms. Shiverdecker allegedly stated to Plaintiff, "you black girls don't believe in birth control, do you?"; and (3) Plaintiff heard through others that Ms. Shiverdecker once said that, had Plaintiff not made it past her probationary employment period, she would fire Plaintiff.

In considering comments purportedly showing discriminatory animus, the Sixth Circuit requires that courts examine "whether [(1)] the comments were made by a decision maker or by an agent within the scope of his employment; [(2)] whether they were related to the decision-making process; [(3)] whether they were more than merely vague, ambiguous, or isolated remarks; and [(4)] whether they were proximate in time to the act of termination." *Cooley v. Carmike Cinemas, Inc.*, 25 F.3d 1325, 1330 (6th Cir. 1994); *see also Blandford v. Exxon Mobil Corp.*, 483 F. App'x 153 (6th Cir. 2012).  "None of these factors is individually dispositive of . . . discrimination, but rather, they must be evaluated as a whole, taking all of the circumstances into account." *Peters v. Lincoln Elec. Co.*, 285 F.3d 456, 477-78 (6th Cir. 2002).

Initially, the Court points out that beyond the lack of evidence demonstrating that Ms. Shiverdecker was involved in the patient abuse investigation, Plaintiff also fails to point to any evidence that Ms. Shiverdecker possessed the authority to terminate her employment.  Thus, Plaintiff cannot show that any of the aforementioned statements were related to the ultimate decision to recommend Plaintiff's dismissal from employment.

21

Based on all of the foregoing reasons, Plaintiff fails to point to evidence in the record to create a genuine issue of material fact on whether Defendant's legitimate, non-discriminatory reason for recommending Plaintiff's dismissal was a pretext for unlawful discrimination.  Accordingly, Defendant's Motion with regard to Plaintiff's disparate treatment claim must be granted.

## IV.  RETALIATION

In addition to age discrimination, Plaintiff alleges that Defendant retaliated against her filing a complaint against Ms. Shiverdecker with the Equal Employment Opportunity Commission.  (Doc. 1, PAGEID 6).  Plaintiff alleges that the Defendant recommended dismissal of Plaintiff in retaliation for filing the EEOC claim against Ms. Shiverdecker.  Plaintiff specifically asserts in her Response that, "[i]n 2008, Connie Shiverdecker issue[d] a Letter of Proposed Removal from employment to Plaintiff after Plaintiff filed her race discrimination complaint with [the] EEOC."  (Doc. 35, PAGEID 576).

---

Further, with regard to the first statement, the Court first notes that it is a vague remark.  In the context of the testimony given by Plaintiff, it appears that the remark simply referred to an apparent opinion that Ms. Shiverdecker viewed Ms. Sumerlot and Plaintiff as having the same strong personality.  In testifying about the conversation in which the purported comment was made, Plaintiff testified that Ms. Sumerlot "has a strong personality, and so do I."  (Doc. 27, PAGEID 241).  Accordingly, the Court concludes that, even assuming Ms. Shiverdecker made this comment, it was a stray comment.

With regard to the second comment, the evidence demonstrates that Ms. Shiverdecker purportedly made this comment in the fall of 2006, a year before the incident involving Plaintiff's father's care and the alleged patient abuse incident.  Thus, there is no evidence that the comment was made in relation to any decision-making process and the evidence shows that it was certainly not proximate in time to any decision-making process regarding the patient abuse allegations.

Finally, with regard to the third comment, the Court notes that the remark, at best, is a vague and ambiguous remark in that, if true, the remark could simply be taken as Ms. Shiverdecker's opinion that Plaintiff was not a good nurse.  In addition, Plaintiff's testimony reveals that Ms. Shiverdecker made the remark near the beginning of Plaintiff's employment, not proximate in time to the recommended termination of Plaintiff's employment or related in any way to any other arguable adverse employment action.

Pursuant to 42 U.S.C. § 2000e-3(a):

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

With regard to participation, "Title VII protects an employee's participation in an employer's internal investigation into allegations of unlawful discrimination where that investigation occurs pursuant to a pending EEOC charge." *Abbott v. Crown Motor Co., Inc.*, 348 F.3d 537, 543 (6th Cir. 2003).

A *prima facie* case of retaliation requires that Plaintiff prove:

> (1) she engaged in activity protected by Title VII; (2) this exercise of protected rights was known to defendant; (3) defendant thereafter took adverse employment action against the plaintiff, or the plaintiff was subjected to severe or pervasive retaliatory harassment by a supervisor; and (4) there was a causal connection between the protected activity and the adverse employment action or harassment.

*Morris v. Oldham Cnty Fiscal Court*, 201 F.3d 784, 792 (6th Cir. 2000) (citation omitted). Here, Defendant challenges the causal connection between the protected activity and the alleged adverse employment action or harassment.

"In order to show a causal connection, a plaintiff must produce sufficient evidence from which an inference can be drawn that the adverse action would not have been taken had the plaintiff not filed a discrimination action." *Allen v. Michigan Dep't of Corr.*, 165 F.3d 405, 413 (6th Cir. 1999) (citing *EEOC v. Avery Dennison Corp.*, 104 F.3d 858, 861 (6th Cir. 1997); *Jackson v. RKO Bottlers*, 743 F.2d 370, 377 (6th Cir. 1984)). "Title VII

23

retaliation claims must be proved according to traditional principles of but-for causation," *i.e.*, plaintiff must prove "that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Univ. of Texas Sw.Med. Ctr. v. Nassar*, 133 S.Ct 2517, 2533 (2013).

In this case, the incident leading to the patient abuse allegations occurred on November 27, 2007, and, thereafter, pursuant to standard practice, Ms. Shiverdecker authored a memorandum to Plaintiff informing her of her detail pending "the outcome of the investigation of alleged patient abuse" on November 29, 2007.  (Doc. 32-2, PAGEID 522).  Only after receiving notice of the investigation did Plaintiff "first contact[] an EEO counselor on December 5, 2007."  (Doc. 1-1, PAGEID 11).

Thus, the investigation into the patient abuse allegations was already underway at the time Plaintiff initiated her EEOC complaint against Ms. Shiverdecker.  Plaintiff points to no evidence that Ms. Shiverdecker took any action with regard to the Board investigation following Plaintiff's complaint to the EEOC.  In fact, the Memorandum of Proposed Removal, dated July 7, 2007, was not issued by Ms. Shiverdecker, and instead, was issued by Carolyn Caver, the Acting Deputy Associate Director at CAVHCS in Alabama on July 7, 2008.  (Doc. 33-2, PAGEID 548-550).

Based on the foregoing, Plaintiff points to no facts upon which a reasonable fact-finder infer a causal connection between Plaintiff's filing of an EEOC charge against Ms. Shiverdecker and the recommendation that Plaintiff be terminated for patient abuse.  In other words, no reasonable fact-finder could conclude the recommended termination would not have issued in the absence of any alleged wrongdoing on the part of Ms.

Shiverdecker.

Assuming Plaintiff could demonstrate a *prima facie* case, Defendant articulates a nondiscriminatory reason for Plaintiff's termination, *i.e.*, the conclusion that Plaintiff engaged in patient abuse.  As a result, "the burden of production returns to the plaintiff to demonstrate by a preponderance of the evidence that the proffered reason was a mere pretext for discrimination."  *Nocholson v. City of Clarksville*, 530 F. App'x 434, 446 (6h Cir. 2013) (citing *Fuhr v. Hazel Park School Dist.*, 710 F.3d 668, 674 (6th Cir. 2013)). As set forth in more detail above, Plaintiff fails to point to any evidence tending to support her contention that the recommended termination was motivated by Ms. Shiverdecker's alleged discriminatory animus toward Plaintiff.

Accordingly, based on the foregoing, Defendant's Motion for Summary Judgment on Plaintiff's retaliation claim must be **GRANTED**.

## V.  CONCLUSION

There being no genuine issue as to any material fact, and Defendant being entitled to judgment as a matter of law, Defendant's Motion for Summary Judgment (Doc. 25) is **GRANTED** in its entirety.  The Clerk shall enter judgment accordingly, and this case shall be terminated on the docket of this Court.

**IT IS SO ORDERED.**

Date:  1/24/14                          ____*/s/ Timothy S. Black*____
                                        Timothy S. Black
                                        United States District Judge